**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

FEDERAL TRADE COMMISSION

    Plaintiff,

       v.

INVITATION HOMES INC., a corporation;

    Defendant,

**Case No. _____**

**COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF**

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), for its Complaint alleges:

1.    The FTC brings this action for Defendant's violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the Gramm-Leach-Bliley Act ("GLB Act"), 15 U.S.C. §§ 6801-6809, §§ 6821-6827.  For these violations, the FTC seeks relief, including a permanent injunction, monetary relief, and other relief, pursuant to Sections 5(m)(1)(A), 13(b), and 19 of the FTC Act, 15 U.S.C. §§ 45(m)(1)(A), 53(b), 57b, and Section 521 of the GLB Act, 15 U.S.C. § 6821.

**SUMMARY OF THE CASE**

2.    For years, Defendant Invitation Homes Inc. ("Invitation Homes" or "Defendant") has used deceptive advertising and unfair practices to charge millions of dollars in junk fees and other bogus amounts that have harmed tens of

thousands of people.

3.      In the wake of the 2008 Great Recession and the foreclosure of millions of homes, multiple large corporations and institutional investors purchased thousands of single-family homes across the country.  Founded in 2012, Invitation Homes was once owned by the private equity firm The Blackstone Group Inc. (n/k/a Blackstone Inc.), before going public in 2017.  Later that same year, Invitation Homes merged with Starwood Waypoint Homes in a "merger of equals."  Invitation Homes emerged as the largest single-family home landlord in the country, owning more than 80,000 homes across 16 geographically diverse rental markets.

4.      Invitation Homes operates a vast advertising campaign that touts remodeled homes, streamlined, tenant-friendly procedures, and an overall "worry-free leasing lifestyle."  Invitation Homes promises consumers that its homes are inspected, that residents will receive "24/7 emergency maintenance," and that residents' security deposits will be deducted only for damage they cause that is more than ordinary wear and tear.

5.      The reality for consumers is starkly different.  Invitation Homes hides junk fees in its rental listings, making the actual price of consumers' monthly lease payments higher than the price the company advertises.  Many Invitation Homes properties are in disrepair, have major habitability issues, or are in need of obvious

maintenance work when people move in, and when residents move out, their security deposits are unfairly withheld for charges that are not their responsibility, including for ordinary wear and tear or pre-existing damage.  Invitation Homes has also harmed residents experiencing hardships related to the COVID-19 pandemic, steering them away from obtaining government protections from eviction.

6.      Invitation Homes has long been aware of these practices and their harm to consumers.  Multiple news articles and investigative reports have documented Invitation Homes' deceptive and unfair practices, including *The New York Times* ("A $60 Billion Housing Grab by Wall Street," March 5, 2020), *Reuters* ("Spiders, sewage and a flurry of fees – the other side of renting a house from Wall Street," July 27, 2018), *The Atlantic* ("When Wall Street is Your Landlord," February 2019), and *The Washington Post* ("At Invitation Homes, unpermitted work leaves leaky plumbing, faulty repairs, renters say," July 12, 2022).  A study by the Atlanta Federal Reserve found that single-family corporate landlords were more likely to file eviction notices than smaller landlords.

7.      Invitation Homes' rental practices also have been the subject of multiple governmental inquiries.  As a result of its conduct during the pandemic, Congress launched multiple inquiries into the company's practices, including the Select Subcommittee on the Coronavirus Crisis ("SSCC") and the House Financial Services Committee.  According to the SSCC's July 2022 "Report on Abuses by

Four Corporate Landlords During the Coronavirus Crisis," approximately 29% of the company's tenants against whom it filed for eviction lost their housing between March 15, 2020, through July 29, 2021, during the height of the pandemic and despite many tenants being eligible for protection under eviction moratoria.

8.    In 2022, McKinsey & Company assessed various aspects of Invitation Homes' business and issued a report to the company detailing its findings. McKinsey's report documented Invitation Homes' ongoing problems with responsiveness and resident experience, particularly in key areas such as maintenance and billing.  For example, McKinsey reported that "[i]n maintenance and general issue resolution, the current experience is 'too slow' compared to competitors . . . and not as high quality due to A) maintenance workers not fixing the core issue and B) multiple billing issues."  McKinsey's report went on to note that "[c]ompetitors have 26% less reoccurring maintenance issues and 60% less billing issues than [Invitation Homes]" and recommended the company investigate the causes of both issues.

9.    In addition to these examples of public reporting, government investigations, and external reports, the company's own internal reports, complaints, and communications show that a pattern and history of deceptive and unfair practices were well-known throughout the company.

10.    Rather than address these issues, Invitation Homes has remained

laser-focused on its bottom line, continuing to deceive and harm consumers through its rental practices.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

12.     Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1), (b)(2), (c)(2), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFF

13.     The FTC is an independent agency of the United States Government created by the FTC Act.  15 U.S.C. §§ 41–58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC also enforces Section 521(a) of the GLB Act, 15 U.S.C. § 6821(a)(2), which prohibits "making a false, fictitious, or fraudulent statement or representation" "to obtain or attempt to obtain" from a customer "customer information of a financial institution."

## DEFENDANT

14.     Defendant Invitation Homes is a Maryland corporation with its principal place of business at 1717 Main Street, Suite 2000, Dallas, TX 75201. Invitation Homes transacts or has transacted business in this District and throughout the United States.  At all times relevant to this Complaint, Invitation Homes has advertised, marketed, promoted, offered, leased, and managed the

rental of its single-family rental homes ("SFRs") to consumers throughout the United States (together, "Home Rental Services").

## COMMERCE

15.     At all times relevant to this Complaint, Defendant has maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## INVITATION HOMES' BUSINESS ACTIVITIES

### Invitation Homes Deceptively Advertises Home Rental Prices and Hides Junk Fees

16.     Invitation Homes lures people to its rental listings by deceptively advertising lower monthly rents than they must actually pay once they are living in their homes.  Baited with these attractive rental prices, people pay nonrefundable fees to apply for an Invitation Homes' listing and reserve the property, only later to learn that the actual monthly rental price is higher than advertised.  Since 2019, people have paid more than $18 million in application fees for listings that were deceptively priced by Invitation Homes.

17.     Invitation Homes accomplishes this drip pricing scheme by charging people for mandatory junk fees that are not included in the advertised rental price and are not adequately disclosed before someone submits a rental application.  For example, since at least 2018, Invitation Homes has added undisclosed fees to residents' rent, first in the form of a "utility management fee," and later a "Lease

Easy bundle" fee, which includes the utility management fee, an "air filter delivery" fee, and a "smart home technology" (or "smart home") fee. This fee bundle, which can add $60 per month to residents' rental payment and $720 over the course of a one-year lease, is mandatory for the substantial majority of the company's homes, yet the costs of these services are hidden from people. As recently as November 2023, the company added yet another mandatory fee that it excludes from the advertised rental price: an $85 monthly "internet package" fee.

18.    Invitation Home's hidden fee bundle is big business. For example, from 2021 to June 2023, Invitation Homes charged consumers over $60 million in Lease Easy fees as part of their monthly rental payments. In 2019, Invitation Homes' CEO called on the company's Senior Vice President responsible for overseeing the company's fee program to "juice this hog" by making the smart home fee mandatory to renters. In 2021, that same Senior Vice President described a proposed price increase of the mandatory smart home fee as "a tactical issue that has garnered the interest of one of the corner offices on the 20th floor" and pledged to the CEO that "between you and I, I have not let this go. I will get it taken care of."

19.    Moreover, Invitation Homes was aware that these profitable fees were excluded from rental listing prices and worked to hide the fees from consumers. For example, when a Vice President asked why consumers could not see the Lease

Easy fees added to the monthly rent amount before they applied, Invitation Homes'
Senior Vice President of Operations confirmed that it was the company's practice
not to display or itemize the fees on the application portal, commenting, "we can't
show all additional fees, so we don't want to show any."  In another example, a
November 2021 Invitation Homes slide deck instructed employees to "only
disclose [the Lease Easy bundle] fee on website pages and other marketing
collateral when critical."  The same slide deck described the company's revision to
a landing page in the Invitation Homes application portal to "update to be more
generic and remove pricing from header."

20.    Invitation Homes also has received numerous consumer complaints
about add-on fees not being included in the advertised rental price.  As one
consumer complained, "if an air filter fee is required then why isn't it include[d] in
your base rent.  It seems very confusing for it to be added after an agreement of
$1850."

21.    Invitation Homes' fee program has significantly padded the
company's bottom line.  For example, a September 2020 Invitation Homes slide
deck to its Board of Directors estimated the "annual impact" of a mandatory smart
home fee to renters to be $24-26 million,[1] and the air filter delivery and utility

---

[1] This estimate was based on a Smart Home fee of $19.95 - $29.95.  Invitation Homes has since
increased the Smart Home fee to $30 for homes without a video doorbell and $40 for homes with
a video doorbell.

management fees to be $4.3–9.5 million and $1.9 million, respectively.

22.    The impact to consumers and the home rental marketplace is significant, even beyond the more than $60 million in hidden fees.  Renters expend money and time to apply to Invitation Homes listings, reserve homes, and relocate their families, only to learn that their monthly payment is higher than advertised.

<u>Invitation Homes' Deceptive Home Listings and Application Process</u>

23.    While Invitation Homes' home listings have changed several times since 2021, all versions have failed to include all mandatory fees in the advertised monthly lease price and have failed to inform people what the total monthly rent is inclusive of fees.

24.    Potential residents who visit Invitation Homes' website, www.invitationhomes.com, can search for a home by entering various specifications, including monthly rental price.  The search populates rental listings that display the advertised monthly rent.  A typical search results page looks like this:



25.    When consumers click on a home, they go to a listing page with photographs of the property and additional information, including the **"Lease for"** price of the home prominently displayed at the top of the listing.  Prior to the company's notification of the FTC investigation, a typical home listing looked as shown below:



26.     When consumers click on the "Apply Now" button at the top of the listing, they are redirected to "Rent Café," Invitation Home's rental application portal, where consumers can enter a move-in date, select a lease duration, and click to begin their rental application.

Basic Lease Information

Home is available for move-in starting on 4/10/2021

| | |
|---|---|
| Move-In Date | 4/7/2021 |
| Lease Term: | 12 months |
| Rent: | $1,690.00 |

**START APPLICATION**

27.     Prior to 2021, and continuing through present day, Invitation Homes has failed to provide the true monthly price that consumers must pay to rent one of its properties.  This is consistent across the listing price displayed in Invitation Homes' property search results, the advertised "Lease for" price on the individual listing pages, and the "Rent" price displayed in the application portal (each depicted above).  Because the company charges mandatory monthly fees on top of the advertised rent, consumers typically paid $40–$45 more per month in 2021, and now must pay $60 to $145 more per month than the advertised monthly lease price.

28.     Thousands of consumers have submitted home rental applications to Invitation Homes and paid nonrefundable fees—including application fees up to $55 and holding fees up to $500 to exclusively reserve a home (which becomes nonrefundable if the consumer does not sign a lease)—to rent at a deceptively lower rental price.  Invitation Homes' holding agreements have reiterated expressly

that the monthly rental amount is the "Lease For" price advertised on the listing, with no reference to mandatory add-on fees.

29.     People do not learn the total monthly cost to rent a home from Invitation Homes until they receive a copy of their lease, which is the first time that Invitation Homes itemizes the mandatory add-on fees and discloses the total out-of-pocket rental cost for the house the consumer is leasing.

30.     By this time, all applicants have paid nonrefundable application fees, and many have paid holding fees and other expenditures related to moving—only to learn that their rent could be as much as $1,740 higher per year.[2]

31.     In many instances, even Invitation Homes' lease packages have misled people about add-on fees and what people can expect to pay monthly for the duration of their lease.  For example, from at least 2019 to 2022, Invitation Homes used a lease with a cover page that misrepresented the recurring monthly fees that people must pay as part of their rent, only disclosing additional fees in an addendum buried toward the end of a 60-page lease.  For instance, the cover page of the lease said the monthly air filter delivery charge would be $0.00, but a buried addendum told consumers the company would charge renters a $9.95 monthly air filter delivery fee after it confirmed the number and size of the air filters in the

---

[2] Invitation Homes offers, and many consumers sign, two-year leases, thus obligating these consumers to $3,480 more in rent than consumers expect to pay.

home.  In many cases, this was not done until after the lease began, meaning the fee would not be added until after people had already moved in and paid one or more months of rent.  One Invitation Homes employee told their manager that this practice was "[a]t best…a contradictory lease in this format.  At worst, we have something that has the appearance of intentional dishonesty."

32.    Invitation Homes also advertises its home listings through third-party websites such as Zillow and Realtor.com where the monthly rental payment is prominently displayed in search engine results and the listing itself.  Just as with the Invitation Homes' website listings, the advertised rental price does not include mandatory fees, and people do not learn the total monthly cost to lease these homes until they receive a copy of their lease—that is, until after paying application fees, and, in many instances, holding fees and moving-related expenses.

33.    By excluding mandatory fees from the advertised monthly price, people also are not able to accurately compare Invitation Homes' home prices with the prices of other companies' homes.

<u>Invitation Homes' Buried Fee Language Confuses and Further Misleads
Consumers</u>

34.    To the extent Invitation Homes includes information about its mandatory add-on fees, this information is inadequate in terms of its content, presentation, proximity, prominence, or placement such that people are unlikely to see or understand the information and are also unlikely to understand that the

advertised lease amount does not include add-on fees.

35.     For example, Invitation Homes buries conditional and confusing

language in its typical listing, variations of which the company has been using

since at least 2021.  Invitation Homes does not present this language in an easily

noticeable or easily understandable manner.  As depicted below, in December

2021, for example, the listing said, "Lease Easy with three great Invitation Homes

services that *come standard in your lease* for up to $45[3] a month:  Smart Home,

Air Filter Delivery and Utility Management."  (emphasis added).



Even if consumers see or read this text—buried in the fourth paragraph of the

listing in text less prominent than the advertised rental price—the language does

---

[3] In January 2021, the Lease Easy bundle fees were $40, before increasing in mid-2021 to $45.
In early 2022, Invitation Homes raised the Lease Easy bundle fees to $55, and raised them again
in mid-2022 to $60.

not clearly explain that the $45 fee is not included in the advertised lease price or

offered as an optional add-on, but is in fact a mandatory monthly fee *on top* of the

advertised lease price (the "Lease for" price) that is prominently displayed at the

top of the listing.

36.     Invitation Homes buries additional information about its fees in gray

microtext at the very bottom of the listing, written in confusing and conditional

language and found only if someone scrolls past a map of the home's location and

photos of other unrelated listings.  In 2021, the text looked as shown below:

Lease your Invitation Home through InvitationHomes.com or with the help of a licensed leasing agent. All leasing information is believed to be accurate, but changes may have occurred since photographs were taken and square footage is estimated. Furthermore, prices and dates may change without notice. Invitation Homes does not lease homes through Craigslist or other classified advertising services. Please note this home may be governed by a HOA and could require additional applications and/or fees. An account set-up fee will be charged on all new leases. To better serve our residents, Invitation Homes is pet-friendly with some breed restrictions and allows up to three pets with a monthly fee. Lease Easy standard services are required in your lease and will be billed monthly as separate items on your account ledger with your rent - up to $45 monthly for all three services: Smart Home in homes with Smart Home features. Air Filter Delivery in homes with an HVAC system. Utilities Management, where available, plus your monthly utility usage. If your home has a pool, there is a $120 monthly pool fee. Broker participation welcome, so please refer to MLS. Please contact your leasing agent for more information.

37.     Only in the middle of the fifth line of microtext at the very bottom of

the page does any purported disclosure language appear: "Lease Easy standard

services are required in your lease and will be billed monthly as separate items on

your account ledger with your rent – up to $45 monthly for all three services:

Smart Home in homes with Smart Home features. Air Filter Delivery in homes

with an HVAC system. Utilities Management, where available, plus your monthly

utility usage."  Even if consumers were to see this tiny, buried language, the text

does not make clear which Lease Easy fees are required for that specific home, nor

that the Lease Easy "standard services" are not included in the advertised "Lease

For" price.

38.    Similarly conditional and confusing language regarding the Lease Easy fees appeared in the 2021 version of the Rent Café application portal, buried in the midst of multiple other application terms and in small blue text set against a blue background, as depicted below:



39.    As with the prior references to Lease Easy, even if consumers were to see this language, the text does not make clear which Lease Easy fees are required

for that specific home.  Further compounding the confusion, on the same page below the Lease Easy text, in the "Basic Lease Information" field, clear text displayed the "Rent" amount and *excludes the Lease Easy fees*.

40.     After learning of the FTC's investigation, the company put more information about fees on its website, but all versions of Invitation Homes' website listings still advertised a monthly leasing price that fails to include any mandatory fees.  And rather than clearly disclosing the amount of the mandatory fees on each listing, Invitation Homes buried general fee information behind hyperlinks it knows consumers will not see.  Invitation Homes' Senior Vice President of Operations conceded that Invitation Homes was aware that "[m]ost people don't look at the link."

41.     Invitation Homes listings on third-party websites like Zillow and Realtor.com similarly fail to adequately disclose to consumers that their ongoing monthly rent obligation includes mandatory add-on fees that are not included in the advertised lease price.  Moreover, while Realtor.com features a dropdown box designed to display fees and costs of a home, there is no such information included about the fees and costs for the Invitation Homes properties.

<u>Invitation Homes Has Received Numerous Complaints About Its Deceptive Rental Advertisements</u>

42.     For years, Invitation Homes has been aware of consumer complaints about its deceptive fee practices.  Since at least 2018, Invitation Homes has tracked

consumer complaints and "escalations," which the company defines as any

instance in which a resident contacts corporate officers about an issue, posts a

negative review or complaint online, or submits a complaint to the Better Business

Bureau.  Monthly reports of escalations, entitled "Resident Voice Reports," are

widely distributed throughout the company, including to senior management and

executives.  These monthly reports summarize resident surveys, reviews, and

complaint metrics, including a breakdown of the percentage of consumer

escalations by issue and the substance of some complaints.

43.     People have complained extensively about hidden fees that Invitation

Homes tacks onto their rent, including the Lease Easy Fees.  For example:

      a.     "Invitation Homes advertises a price to rent a home and in their

advertisement the[y] mention an option of adding SMART home and

Filter maintenance.  However these are not options they are

requirements and as such should be added to the rental price and not

listed on the website as options."

      b.     "They advertised the home as for rent for $1586.  They then

add on water bill, monthly pool fee, smart home fee, dog fee and all

these other fees so the rent goes up to $1800."

      c.     "I'm moved in paying for smart home, oh yes, besides the rent,

IH tacks on additional fees for that and just about everything else, so

beware prior to signing a contract."

44.    Notably, just one month after Invitation Homes made the Lease Easy fees mandatory, the company's February 2021 Resident Voice Report documented a significant jump in consumer complaints about additional fees, and the company noted in its April 2021 Resident Voice Report that escalations about additional fees were "trending up."

<u>Invitation Homes Rejected a Proposal to Disclose the Total Monthly Rent to Consumers</u>

45.    Invitation Homes has continued to hide the true total rental price of its homes, even while recognizing that the company uses hidden fees in marketing its rental homes.

46.    In a June 2021 email, Invitation Homes' Senior Vice President of Operations emailed other senior executives about whether the company should begin "just listing homes at the full asking price, inclusive of all of the mandatory programs, with a breakdown of what is included . . . We agree that it is the best approach given the current market conditions and the desire to be more transparent in communicating true cost to prospective residents with the various market nuances when it comes to what and how we charge."

47.    Consistent with this proposal, in July and August 2021, Invitation Homes' marketing department circulated a slide deck and listing mockup that would include all mandatory fees in the advertised price, saved with a file name of

"Bundled Price Transparency and Rent Calculator."  The company's Senior Vice President of Marketing and Customer Experience explained that the proposed listing change was "about no hidden fees or similar idea, with rent calculator as a tool."  She further explained that consumers are "trying to understand anything related to the mandatory services above as well as basic optional services."

48.     Despite this recognition that the company was using "hidden fees" and that consumers expect rent prices to be transparent and include all mandatory fees, Invitation Homes continues to deceptively exclude mandatory monthly fees from the advertised rental price.

49.     Consumer complaints have persisted.  For example, in May 2022, a Vice President of Operations commented on an "uptick in BBB [complaints] regarding fees," stating, "Please speak with your team to verify they are going over all fees.  We need this disclosed during leasing process, not once the lease is generated.  People seem to not know about filter fee charge/but filter is delivered once per quarter."  Through late 2023, "additional fees" has remained one of the top five most escalated issues.

**Invitation Homes Misrepresents that Its Homes Pass Quality Assurance Inspections Before Move-In and that It Provides 24/7 Emergency Maintenance**

50.     Invitation Homes also misrepresents to consumers that its homes pass a "quality assurance inspection" and are supported by "24/7 Emergency

Maintenance."  In fact, as the media has documented for years, numerous Invitation Homes properties are in disrepair and even have significant habitability problems, leaving renters on their own to deal with plumbing issues, broken appliances, and hazardous conditions including mold, pests, and exposed wiring, when they move into their new home.

<u>Invitation Homes' Claim that its Homes Pass a "Quality Assurance Inspection" Is<br>False or Unsubstantiated</u>

51.    Since at least 2018, Invitation Homes has claimed on its website that each home passes a "multi-point quality assurance inspection" before a new resident moves in.  But Invitation Homes has not substantiated that it completes an inspection before each new resident moves in.

52.    In fact, in numerous instances, new residents move into an Invitation Homes property that needs immediate or serious maintenance, repairs, or cleaning. Between 2018 and 2023, residents in 33,328 properties submitted at least one work order within the first week after they moved in, for issues including plumbing, electrical, and heating and air conditioning service requests.

53.    In one example, a resident complained that their new home had exposed wires and broken kitchen appliances, while another complained about "being advertised a home that was clearly not able to be lived in . . . with mold, rat feces, broken fridge, broken fence, spiders, and webs throughout, and not being cleaned upon arrival."

54.    Invitation Homes employees have known that many of their homes do not meet the company's advertised standards at move-in.  For example, one employee noted, "The number of resident complaints I field from new move-ins related to the home not being lease ready is both alarming and growing."  A senior manager overseeing a region covering thousands of homes told her team that their work to prepare houses for new residents (called a "turn") was "the worst I have ever seen things operating.  Let[']s clean it up together and quickly as I am months into this train wreck and ready to see something improve. . . . The business is barely operational at this point and, while not 100% of that is controllable, guys, I have to look up and ask what is going on here in regard to turn quality?"

### Invitation Homes Fails to Provide 24/7 Emergency Maintenance

55.    Since at least 2018, Invitation Homes has advertised across its website that it provides "24/7 emergency maintenance."  According to the company's FAQs, residents can expect that "[a]n emergency request is handled right away" and informs residents that emergency maintenance issues are ones that are "dangerous, hazardous, or could cause damage to the property or your personal well-being without immediate attention."

56.    Numerous residents have complained about being forced to endure days and even weeks in unacceptable—and sometimes dangerous—conditions, including no heat in the middle of winter, no air conditioning in the middle of

23

summer, and flooding or sewage backing up in the home.  For example, one resident complained that "[w]e lost heat in the dead of winter while I was 6 months pregnant.  Called their 'emergency line' to only be told no one could come out for 2 days."  Another resident complained that they had "raw sewage back up where feces were over flooding in my shower and bathroom that I fixed myself due to the safety of my children" but "didn't even[] receive a call back [from Invitation Homes] until 96 hours and nobody even came to fix it until day 6 after I already fixed myself (temporally) [sic]."

57.    According to the company's own internal consumer research, 24/7 emergency maintenance is significantly more important to people who rent from a professional company like Invitation Homes than to people who rent from "mom & pop" landlords.  Even the Executive Vice President of Operations, responsible for overseeing Invitation Homes' maintenance program, stated that he would not accept his own company's delays at his home.  Reacting to a resident's complaint, he said "72 hours [to repair broken heat] seems excessive when I can pick up the phone and have a service company at my home on a same day basis."

58.    Despite the chronic shortcomings of its inspections and 24/7 emergency maintenance services, Invitation Homes continues to tout that each home passes a quality assurance inspection before each resident moves in, and that all its homes are backed by 24/7 emergency maintenance.

**Invitation Homes' Deceptive and Unfair Security Deposit Deductions**

59.     Invitation Homes promises people it will return their security deposits, with deductions only for damage the resident causes beyond ordinary wear and tear.  In fact, Invitation Homes withholds security deposits from people for illegitimate reasons, including for normal wear and tear, for damage that existed before the resident even moved in, and for maintenance, repairs, or improvements that the company has pledged to cover.  These practices are directly at odds with the marketing campaign Invitation Homes uses to attract consumers to its listings, which includes clear representations that security deposits will be deducted only for damage the resident causes beyond normal wear and tear.

60.     In addition to this deceptive conduct, Invitation Homes operates an unfair move-out and refund process that is skewed against renters, causing consumers to lose hundreds or thousands of dollars to Invitation Homes for improper charges.

61.     After move-out, an employee walks through the home and assesses everything that needs to be repaired or renovated before a new tenant moves in. All the charges are then placed on residents' ledgers, regardless of whether they were the residents' responsibility or not.  Then, a different employee—who never sets foot in the home—determines whether the charges on the ledger should actually be passed on to the former resident.  However, for multiple reasons—

including inadequate training, inconsistent and unclear definitions of wear and tear, and budget and time constraints—this process is riddled with errors. As the Senior Vice President of Operations told their boss, the Executive Vice President of Operations, the company's security deposit refund process "is automated enough that the property management teams aren't looking closely enough at the charges before they are put on the resident's ledger."

62.    In addition to a process that facilitates the improper retention of security deposits, entire regions covering thousands of homes took drastic measures to retain consumers' security deposits. For example, one region stopped all internal reviews of damage assessments (an integral part of the company's security deposit refund process), only reviewing and reversing charges against security deposits if residents disputed them. One Invitation Homes Vice President even suggested this practice to Vice Presidents of other regions as an effective way to process security deposit charges and refunds. When senior executives were made aware of this practice, they did not immediately shut it down, instead agreeing to "evaluate the pros and cons with respect to return on effort and impact to customer experience." After one resident was sent to collections due to this practice, a deposit accountant who flagged this conduct stated to his superior, "I think it's wrong for a tenant to have had gone to collections and get dinged on their credit because we didn't provide them with genuine care or doing the right thing.

I'm sure I will have more examples soon but I wanted to send this one right away."

63.    In another region, a property manager instructed their team to leave questionable charges on residents' ledgers and "negotiate the charge if challenged."

64.    The company is aware that it is deceptively and unfairly pocketing consumers' hard-earned money through its security deposit refund practices, but it has not taken sufficient action to stop the harm to consumers.  To the contrary, many employees have felt pressure to overcharge residents.  Internal pressure to meet budgets has led some employees to be "more aggressive on resident charges at move out," and as one employee told the Senior Vice President of Marketing, "[t]his is how we get upset residents but also make the numbers [the Chief Financial Officer] communicated investors need [to] see."  Along similar lines, in March 2020, the National Director of Rehabs, Turns, and Maintenance told senior executives that employees were making decisions about security deposit deductions "based on what they are being lead [sic] to select by market leadership without the ability to consider proration or clear direction of wear and tear."  And numerous residents who have tried to dispute the charges against their security deposit have encountered significant obstacles in reaching the company, including not receiving any response for days or longer.

65.    Invitation Homes withholds residents' security deposits at a rate that

is nearly double the national average.  Between 2020 and 2022, Invitation Homes returned only 39.2% of consumers' total security deposit dollars collected, compared to the national average of 63.9%.  In that same period, nearly 48,000 residents had an average of $1,205 withheld from their security deposits, leaving only 10% of Invitation Homes' residents who received a full security deposit refund.

66.    As with its hidden fee income, these withheld security deposits significantly pad the company's bottom line.  Between 2020 and 2022, Invitation Homes withheld $57,816,492 out of $94,548,775 in security deposits—or 60.8% of the security deposit money consumers paid to the company.  The company also charged outgoing residents additional move-out charges totaling over $42 million, for a total of nearly $100 million charged to residents upon move-out in just three years.

67.    The company retains any amounts withheld from security deposits that exceed the cost of repairs made to the home.  Invitation Homes does not conduct a reconciliation process or refund excess security deposit funds not used for repairs to residents.

Invitation Homes Deceptively Promises Consumers It Will Not Withhold Security Deposits Unless Damages Exceed Normal Wear and Tear

68.    Since at least 2018, Invitation Homes has told people that "[a]ll homes age with use, so you are not liable for the natural aging of the home" and that

"[y]our deposit will only be deducted from damages caused to the property that are more than reasonable wear and tear."  The current version of the website is shown below:



**Security Deposit Guide**

To maximize your security deposit return, check the detailed list below and clean, repair, or replace items that may cause deductions.

69.    Invitation Homes likewise represents to both current and potential residents that a portion of a resident's security deposit may be used to "restore [the] home to the way it looked and functioned when [the resident] moved in, assuming normal wear and tear."

70.    These representations are repeated throughout Invitation Homes' website, its Move Out Guide, and its leases.

71.    Despite its promises to the contrary, Invitation Homes has, in numerous instances, withheld money from people's security deposit refunds for ordinary wear and tear, damages that existed before a person even moved into the home, and for renovations and general maintenance.

72.    Among other things, Invitation Homes has improperly charged residents for ordinary wear and tear to carpets and flooring, paint, walls, and for

other ordinary usage of a home.

73.    For example, for years, Invitation Homes used a software program to calculate what residents owed upon move-out to replace carpet and to repaint walls, two of the highest categories of deductions from security deposits. However, due to a known glitch in the program—which Invitation Homes knowingly failed to fix—residents were routinely charged hundreds or thousands of dollars for ordinary wear and tear to carpet and paint.

74.    In another example, at least one region improperly withheld money from residents' security deposits so the region's Vice President of Operations could meet Invitation Homes' increasingly tight rehab and maintenance budgets. Among other things, this Vice President of Operations required the region to withhold security deposits to pay for pressure washing the exterior of homes— even though residents were not responsible for pressure washing—because it would be a "massive hit to my [Rehab & Maintenance] budget if we are no longer billing these pressure washing violations back to residents."  Brushing off a warning about safety concerns with residents pressure washing roofs and two-story homes themselves, the Vice President simply replied, "I would at least like to get half of the money back."

75.    Numerous residents have complained about charges for ordinary wear and tear or for damages that existed before they even moved in.  For example, one

resident complained, "[Y]ou are charging me for typical wear and tear items, (which are not covered by security deposits) like touch up painting…Heck, you are even trying to charge me for 'checking plumbing lines' – what?"  Another consumer complained to the company that "[t]here are things on this move out statement that you are trying to charge me for that were already there and documented on the move in checklist."

### Invitation Homes' Security Deposit Process is Unfairly Skewed Against Consumers

76.     From the start of the move-out process, Invitation Homes provides confusing and misleading information about the steps residents can take to retain as much of their security deposit as possible.

77.     Invitation Homes explains on its website that approximately three weeks before a resident moves out of the home, "an associate will visit [the] home and point out things that need to be repaired, cleaned, or replaced before [the] final Move-Out Inspection" so that residents can "maximize [their] security deposit return."  Residents understand from Invitation Homes that the purpose of this pre-move-out visit is to help them receive the maximum security deposit refund.  But in numerous instances, Invitation Homes deducts items from residents' security deposits without informing residents of these charges during the pre-move out visit.

78.     Multiple residents have complained about being charged for items that

were either never flagged during the pre-move-out visit or which were explicitly

identified as not being their responsibility:

a.      "We were warned by former tenants that told us 'good luck' on

getting back our security deposit.  Well we learned the hard way after

them taking close to a thousand dollars out of our refund, both for

items that were not mentioned in the pre move out inspection with

Andrew as well as items that he told us did not need to be addressed.

He told us that our lawn looked good and that we didn't need to do

anything with it (which by the way the inspection states that it needs

to be in the condition in which it was when we moved in). The home

had been empty for over a year when we moved in and the yard had

not been touched."

b.      "I am SERIOUSLY pissed off at the notice I just received

regarding my deposit. During the pre move out inspection, which was

done with an empty and cleaned house, there were zero deficiencies

noted. The paint was called out to me as normal wear and tear for two

years of occupancy. He told me the landscaping looked great. He even

said this was probably the best looking pre move out inspection he's

ever walked through. To then find out I am being charged hundreds of

dollars for items that were NOT called out and that I was given no

opportunity to correct because I was told there was NOTHING to correct."

c.    After receiving her security deposit refund with almost one thousand dollars in charges, one resident complained that the associate who conducted her pre-move-out visit told her the house was in amazing condition and there were no concerns to address.  "Mind you, I was told that the purpose of this [pre] Move Out survey was to ensure that I would receive my full security deposit."

79.    Invitation Homes employees have acknowledged that the pre-move-out visit program frequently failed to help residents maximize their security deposit return.  For example, in an internal discussion where employees noted that many BBB complaints the company received were due to move out charges, one manager stated: "Happens to[o] often they tell residents everything is ok and then turn around and charge them back on a lot of items."

80.    After one resident was charged $500 to repaint walls despite it not being raised during the pre-move-out visit, a marketing associate flagged the complaint to the Senior Vice President of Marketing, noting, "This is an example of our lack of transparency – particularly relative to painting."

81.    Invitation Homes' security deposit dispute process likewise makes it extraordinarily difficult for people to receive security deposit refunds to which they

are entitled.

82.    For example, in numerous instances, Invitation Homes does not automatically refund people when it assesses improper charges.  Instead, Invitation Homes puts the onus on residents to call and complain.  Yet when residents try to contact someone at Invitation Homes to dispute their security deposit charges, they are often unable to reach anyone with authority or do not receive any response for days, weeks, or even longer, if at all.  Residents frequently resort to emailing corporate officers, posting negative reviews or complaints online, or submitting a complaint to the BBB, which, as noted above, the company tracks as "escalations."

83.    When an Invitation Homes associate has followed up on an escalation, in many instances the associate has admitted that the charges were in fact assessed for improper reasons.  Simply put, the company waits to see if the resident will challenge the charges before reversing them.

84.    In thousands of instances, the company charges more than the amount of a resident's security deposit, resulting in residents owing money to Invitation Homes.  Residents who are unable to reach an associate to dispute the charges are forced to choose between paying the disputed amount by Invitation Homes' deadline and hoping to later obtain a refund, or continuing to contest the charges and risk being sent to collections.  In one example from September 2021, Invitation Homes sent a resident to collections even though it improperly charged the resident

over $1,000 in damages that the resident did not owe.

85.     In another example of how the company's security deposit process is stacked against residents, a property manager emailed their boss, a Vice President of Operations in charge of a region covering thousands of homes, to inform them: "I have instructed my team that if it is 100% removable to credit/reverse it, but if it is questionable to leave it and we can negotiate the charge *if challenged*." (emphasis added).  Thus, residents bore the burden of spotting and challenging improper deductions in the hopes their dispute would be both: 1) heard (despite no such guarantee given the company's documented poor customer service), and 2) successful.

86.     As a result of these acts and practices, and in numerous instances, Invitation Homes bills residents for charges on their security deposit refund statements that residents do not owe.

<u>Invitation Homes Is Aware of Its Unfair Security Deposit Refund System</u>

87.     Invitation Homes is well aware of the unfair practices permeating the company's security deposit refund dispute system.  The monthly Resident Voice Reports described above show that security deposit refunds are among the top five most-escalated issues by residents in virtually every month for which records are kept.

88.     In August 2019, the company's Chief Operating Officer emailed the

company's senior operations executives a slide deck that analyzed the company's "non-maintenance escalations." Escalations about security deposits composed the highest percentage of non-maintenance escalations, at 24% of all non-maintenance escalations. The COO explained: "The non-maintenance escalation noise coming from the field right now is very loud. We are all feeling it, including [the Chief Executive Officer], [the Chief Financial Officer], and [the Chief Legal Officer and General Counsel]." The company uses the term "noise" to reference resident complaints.

89.    Invitation Homes' senior management also regularly exchange emails about complaints and escalations related to security deposit refund disputes. For example, in December 2020, a Vice President of Operations of one region emailed their boss, the Senior Vice President of Operations-East, noting an increase in BBB complaints due to former residents disputing the charges against their security deposits.

## Invitation Homes Has Employed Unfair Eviction Practices, Including During the COVID-19 Pandemic

90.    Invitation Homes has also engaged in unfair eviction practices that have harmed its residents, including those experiencing hardships related to the COVID-19 pandemic.

91.    For example, during the pandemic, Invitation Homes steered residents away from obtaining government protections from eviction.

36

92.     During the COVID-19 pandemic, the federal government implemented temporary renter protections to protect vulnerable Americans.  From March 27, 2020, through the end of August 2020, the Coronavirus Aid, Relief, and Economic Security (CARES) Act mandated that landlords could not evict, initiate an eviction, or charge certain fees related to the nonpayment of rent from certain tenants covered by the CARES Act. (CARES Act, Section 4024).  On September 4, 2020, the Centers for Disease Control and Prevention (CDC) issued an Agency Order ("CDC Order") under Section 361 of the Public Health Service Act temporarily halting residential evictions to prevent the further spread of COVID-19. (85 Fed. Reg. 55292).  For nearly a year, there was a "CDC Eviction Moratorium" in effect for people who submitted a declaration to their landlord (the "CDC Declaration") that they met certain criteria.  On March 29, 2021, the FTC Acting Chair and the Consumer Financial Protection Bureau Acting Director issued a statement that "[e]victing tenants in violation of the CDC, state, or local moratoria, or evicting or threatening to evict them without apprising them of their legal rights under such moratoria, may violate prohibitions against deceptive and unfair practices, including under the Fair Debt Collection Practices Act (FDCPA) and the Federal Trade Commission Act."

93.     When the COVID-19 pandemic began, Invitation Homes created a "Hardship Affidavit," which was an online form that residents could use to

communicate pandemic-related hardships to the company.  The company directed residents to use the Hardship Affidavit to facilitate discussion with the company about "your specific situation and available options" and promised it was "committed to working with those impacted and being fully compliant with all the state/local protections that have been adopted over the last few months."  On its website, Invitation Homes informed residents that once they submitted a Hardship Affidavit, "[p]lease know we will take no further action on your residency status if you are responsive when you are contacted."  The company promoted the Hardship Affidavit on its website and in communications with residents, and the information gathered from the completed form was stored in the company's system of record.

94.     Despite invoking legal process with the word "Affidavit," the Hardship Affidavit did not protect residents from eviction because the company did not treat the Hardship Affidavit as a substitute for the CDC Declaration.  While the company used the information it learned from the Hardship Affidavit to make decisions about how to treat residents with financial hardships during the pandemic—including whether to evict them—the Hardship Affidavit did not have any legal effect with respect to the CDC Eviction Moratorium.  And although Invitation Homes referenced the CDC and CDC Order in its frequently asked questions on its Coronavirus Response webpage, it did not link to the CDC Order or the CDC Declaration.  While the company promoted the Hardship Affidavit to

its residents, it steered residents away from submitting the CDC Declaration and invoking the protections of the CDC Eviction Moratorium.

95.    For example, Invitation Homes developed a scripted response for when a resident protested that "You can't charge me rent or You can't evict me because the Governor issued an order or the CDC said so."  The company instructed employees to respond: "I'm so sorry. I know this is a difficult time. We are working within the government guidelines, and while many jurisdictions have temporarily paused evictions, they have indicated the rent due during this emergency declaration still needs to be paid. We want to work with you to pay your rent."  The script did not mention the CDC Declaration.

96.    As another example, multiple employees were alarmed when they briefly thought an external call center might be instructing residents to submit CDC Declarations.  After a resident reported that the call center had "instructed him to fill out the CDC dec," a regional employee commented "I am really hoping this is not the case, but can you confirm . . . that they've not been instructed to provide this direction to the residents?"  The message made its way up the chain, including to numerous corporate employees, accompanied by the following message: "I just want to confirm that the [call center] team is not instructing our residents to complete CDC declaration forms."

97.    In numerous other instances, when residents asked Invitation Homes

about the CDC Moratorium protections, Invitation Homes either did not respond or told residents their only options were to pay rent, accept balance forgiveness, or undergo the eviction process, despite the fact that residents could also invoke the protections of the CDC Eviction Moratorium by submitting a CDC Declaration or its equivalent.  For example, one resident stated, "As of now the only options I have been given are: 1. Enter into a payment plan and pay off the balance 2. Move out and have balance forgiven 3. Eviction will be filed."

98.     In another example, a resident who submitted a CDC Declaration was told by an Invitation Homes employee that "[a]lthough this program allows you to stay in our home through the moratorium, it does not prevent us from pursuing collection actions *or possession of our property in which you occupy* . . . As of today, your options are the following: Make the $3500 payment . . . Accept the Balance Forgiveness offer . . . Stay in the home, not make the $3500 payment or enter into an agreement, and we would proceed with *pursuing possession of our home* per CDC guidelines." (emphasis added).

99.     Residents who knew about and wanted to invoke the protections of the CDC Moratorium faced additional barriers to benefitting from the law. Residents could submit the CDC Declaration to the company only by emailing an attachment or dropping a hard copy at one of the Company's offices—in contrast to the simple submission of the Hardship Affidavit through a form on the

company's website.  The company also did not have a systemized way to keep track of CDC Declarations submitted by residents in advance of eviction proceedings. When a resident did submit a CDC Declaration to Invitation Homes, it was Invitation Homes' policy to continue with an eviction proceeding and ask the judge to determine the validity of the CDC Declaration.

100.   Residents were also confused about the purpose and effect of submitting a Hardship Affidavit and did not understand that it would not protect them from eviction proceedings.  One resident emailed their local office asking, "please let me know why I received an eviction notice at my house after I had already done the affidavit online[?]"

101.   Even some Invitation Homes employees did not understand the difference between the Hardship Affidavit and the moratorium declarations.  One employee in California, which had stronger protections than the CDC Eviction Moratorium, asked "Is a Hardship Affidavit = [California] COVID Declaration of Financial Hardship per the law/courts?  If not, what was the point of residents submitting a Hardship Affidavit?"

102.   Numerous residents who had been sued for eviction settled with Invitation Homes so they could stay in the home.  In the settlements, residents entered into payment plans in which they expressly waived the protections they were otherwise entitled to under the CDC Moratorium.  As a result, residents could

not rely on the CDC Moratorium if they became unable to pay under the payment plan and Invitation Homes later sued for a new instance of nonpayment of rent.

103.   In addition to steering residents away from the protection of the CDC Eviction Moratorium, during the same period Invitation Homes also initiated eviction proceedings against residents the company knew had already moved out, which in some cases resulted in eviction filings appearing in residents' tenant screening background reports when they looked for a new place to live.  For example, in one instance during the pandemic, Invitation Homes told a resident that if she moved out, she could avoid having an eviction on her rental history. The resident moved out with the company's knowledge, yet the company still filed an eviction suit against her.  In another instance during the pandemic, Invitation Homes sent a pay-or-quit notice (a legal document that serves as the first step of an eviction proceeding) to a resident who had notified the company a month earlier that she had moved out of the house.  In yet another instance, a resident agreed to move out in exchange for balance forgiveness, but when her son returned to the house two days later, he discovered an eviction notice posted on the door.

## Invitation Homes Used Its Misrepresentations to Entice Consumers to Hand Over Their Financial Information

104.   Invitation Homes has used the misrepresentations set forth above to obtain or attempt to obtain consumers' sensitive personal and financial information.

105.   To apply for and rent one of Invitation Homes' properties and obtain Invitation Homes' Home Rental Services, consumers have to provide financial information such as bank account, credit card, or debit card information to pay application or holding fees, move-in funds, or security deposits.  When consumers apply, Invitation Homes gains access to consumers' financial information.  It is Invitation Homes' policy to comply with laws protecting and safeguarding consumer financial information, including specifically the GLB Act.

## VIOLATIONS OF THE FTC ACT

106.   Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

107.   Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

108.   Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

## COUNT I

## Misrepresentation of the Monthly Leasing Price

109.   In connection with its Home Rental Services, Defendant represents, directly or indirectly, expressly or by implication, that the advertised monthly

leasing price is the total monthly amount that consumers will pay to rent one of Defendant's homes.

110.   In fact, Defendant's representations are false.  The advertised monthly leasing price is not the total monthly amount that consumers will pay to rent one of Defendant's homes because it does not include monthly fees that consumers must pay.

111.   Therefore, Defendant's representations as described in Paragraph 109 constitute a deceptive act or practice and the making of false advertisements in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT II

### Failure to Disclose Mandatory Fees

112.   In connection with its Home Rental Services, Defendant represents, directly or indirectly, expressly or by implication, that the advertised monthly leasing price is the total monthly amount that consumers will pay to rent one of Defendant's homes.

113.   When Defendant makes the representation set forth in Paragraph 112, Defendant fails to disclose or disclose adequately to consumers that the advertised monthly leasing price does not include monthly fees consumers must pay.  This fact or additional information would be material to consumers in deciding whether to proceed with the application process to rent a home, including paying

application fees, holding fees, and other funds to obtain the Home Rental Services from Invitation Homes.

114.   In light of the representation described in Paragraph 112, Defendant's failure to disclose or disclose adequately the material information as described in Paragraph 112 constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT III

## Misrepresentation of Quality Assurance Inspections and 24/7 Emergency Maintenance

115.   In numerous instances in connection with its Home Rental Services, Defendant represents, directly or indirectly, expressly or by implication, that:

> a.   its rental properties pass a quality assurance inspection before residents move in; and

> b.   it provides 24/7 emergency maintenance.

116.   In fact, in numerous instances in which Defendant has made the representations described in Paragraph 115, Defendant's representations are false or unsubstantiated.

117.   Therefore, Defendant's representations as described in Paragraph 115 constitute a deceptive act or practice in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a).

## COUNT IV

### Misrepresentations of Deductions Against Security Deposits

118.   In numerous instances in connection with its Home Rental Services, Defendant has represented, directly or indirectly, expressly or by implication, that consumers' security deposits will only be deducted for damage the resident causes beyond normal wear and tear.

119.   In truth and in fact, in numerous instances in which Defendant has made the representations set forth in Paragraph 118, Defendant has charged residents for amounts that are not their responsibility, including for ordinary wear and tear, damages that pre-dated a resident's tenancy, and maintenance, repairs, or improvements that are Invitation Homes' responsibility.

120.   Therefore, Defendant's representations as described in Paragraph 118 are false and misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT V

### Unfair Security Deposit Charges

121.   In numerous instances, Defendant has withheld money from residents' security deposits or otherwise charged amounts against residents' security deposits for charges that residents do not owe, are not residents' responsibility, or for which residents are not liable.

122.   Defendant's acts or practices cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

123.   Therefore, Defendant's acts or practices as described in Paragraph 121 constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a) and (n).

## COUNT VI

## Unfair Eviction Practices

124.   In numerous instances, Defendant has engaged in unfair eviction practices, including:

      a.   during the COVID-19 pandemic, steering residents away from invoking legal protections against eviction; and

      b.   pursuing eviction proceedings against former residents who had vacated the property.

125.   Defendant's acts or practices caused substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

126.   Therefore, Defendant's acts or practices as described in Paragraph 124 constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a) and (n).

## VIOLATIONS OF THE GRAMM-LEACH-BLILEY ACT

127.   Section 521 of the GLB Act, 15 U.S.C. § 6821, became effective on November 12, 1999, and remains in full force and effect. Section 521(a)(2) of the GLB Act, 15 U.S.C. § 6821(a), prohibits any person from "obtain[ing] or attempt[ing] to obtain . . . customer information of a financial institution relating to another person . . . by making a false, fictitious, or fraudulent statement or representation to a customer of a financial institution."

128.   The GLB Act defines "customer" to mean "with respect to a financial institution any person (or authorized representative of a person) to whom the financial institution provides a product or service, including that of acting as a fiduciary." 15 U.S.C. § 6827(1).  The GLB Act defines "customer information of a financial institution" as "any information maintained by or for a financial institution which is derived from the relationship between the financial institution and a customer of a financial institution and is identified with the customer." 15 U.S.C.  § 6827(2).

129.   Section 522(a) of the GLB Act, 15 U.S.C. §6822(a), empowers the FTC to enforce Section 521 of the GLB Act "in the same manner and with the same power and authority as the [FTC] has under the Fair Debt Collection Practices Act [FDCPA] . . . to enforce compliance with such Act."

130.   Section 814(a) of the FDCPA, in turn, makes a violation of the

FDCPA an unfair or deceptive act or practice in violation of the FTC Act. 15 U.S.C. § 1692l(a).  Section 814(a) of the FDCPA further provides that all of the functions and powers of the FTC under the FTC Act are available to the FTC to enforce compliance by any person with the FDCPA, including the power to enforce provisions of the FDCPA in the same manner as if the violation had been a violation of an FTC trade regulation rule.

131.   Thus, pursuant to Section 522(a) of the GLB Act, the FTC may enforce Section 521 of the GLB Act in the same manner as if a violation of the GLB Act were a violation of an FTC trade regulation rule.

132.   Section 19 of the FTC Act, U.S.C. § 57b, authorizes this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from violations of the FTC trade regulation rules.  Accordingly, Section 19 of the FTC Act, 15 U.S.C. § 57b, also authorizes this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from violations of the GLB Act.  This relief may include, and is not limited to, rescission or reformation of contract, and the refund of money or return of property.

## **COUNT VII**

### **Use of False, Fictitious, or Fraudulent Statements to Obtain or Attempt to Obtain Customer Information of a Financial Institution**

133.   In numerous instances in connection with its Home Rental Services,

Defendant has made false, fictitious, or fraudulent statements or representations to customers of financial institutions to obtain or attempt to obtain customer information of a financial institution.  The customer information of a financial institution that Defendant obtains or attempts to obtain includes consumers' bank account, credit card, and debit card numbers.

134.   Defendant has obtained or attempted to obtain the customer information of a financial institution by representing, directly or indirectly, expressly or by implication, that consumers:

a.      could rent Invitation Homes' properties for the advertised monthly leasing price;

b.      will not be charged except for damages they cause beyond ordinary wear and tear.

135.   Defendant's representations as described in Paragraph 134 are false, fictitious, or fraudulent within the meaning of Section 521 of the GLB Act.

136.   Therefore, Defendant's acts and practices as described in Paragraph 134 violate Section 521 of the GLB Act, 15 U.S.C. § 6821, and constitute deceptive acts and practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## **CONSUMER INJURY**

137.   Consumers are suffering, have suffered, and will continue to suffer

substantial injury as a result of Defendant's violations of the FTC Act and the GLB Act. Absent injunctive relief by this Court, Defendant is likely to continue to injure consumers and harm the public interest.

### PRAYER FOR RELIEF

Wherefore, the FTC requests that the Court:

a.  Enter a permanent injunction to prevent future violations of the FTC Act and the GLB Act.

b.  Award monetary and other relief within the Court's power to grant.

c.  Award any additional relief as the Court determines to be just and proper.

Respectfully submitted,

Dated:  September 24, 2024                    */s/ Michael A. Boutros*

MICHAEL A. BOUTROS
Georgia Bar No. 955802
ROBIN L. ROCK
Georgia Bar No. 629532
MARGUERITE MOELLER
*Provisionally Admitted to N.D.Ga.*
CHRISTOPHER GLEASON
Georgia Bar No. 105493
NATALYA RICE
Georgia Bar No. 975012
Federal Trade Commission
Southeast Regional Office
233 Peachtree St., Suite 1000
Atlanta, GA 30303
Phone: (404) 656-1351 (Boutros)
Phone: (404) 656-1368 (Rock)
Phone: (404) 656-1364 (Moeller)
Phone: (404) 656-1352 (Gleason)
Phone: (404) 656-1367 (Rice)
Email: mboutros@ftc.gov
Email: rrock@ftc.gov
Email: mmoeller@ftc.gov
Email: cgleason@ftc.gov
Email: nrice@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION